**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

| | | |
|---|---|---|
| **TARA STEWARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | |
| | ) | **REQUEST FOR JURY TRIAL** |
| **CJS HOLDINGS, INC., f/k/a** | ) | |
| **LIA GREAT BEND, INC., d/b/a** | ) | |
| **ALLIANCE INSURANCE GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

SERVE:      Registered Agent:
            Cody J. Smith
            115 N Ohio Street, Suite 200
            Salina, Kansas 67401

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff Tara Steward, by and through undersigned counsel, and for her cause of action against Defendant CJS Holdings, Inc., formerly known as LIA Great Bend, Inc. and at all times doing business as Alliance Insurance Group, states as follows:

1.     Plaintiff is a female and resident of Johnson County, Kansas.

2.     Defendant CJS Holdings, Inc., formerly known as LIA Great Bend, Inc. and at all times doing business as Alliance Insurance Group ("Defendant") is a Kansas corporation properly registered and doing business throughout Kansas, including Johnson County. Defendant's principal place of business is in Atlanta, Georgia.

3.     At the time of the adverse actions at issue in this lawsuit, Defendant was named "LIA Great Bend, Inc."

4.     Following the events giving rise to this lawsuit, Defendant changed its name to "CJS Holdings, Inc.", with the changing being effective as of November 2, 2020.

1

5.      Defendant kept the same Business Entity ID Number assigned by the Kansas Secretary of State, and did not reform as a new company; the entity is the same with only the name having been amended.

6.      Defendant operates an office located in Johnson County, Kansas.

7.      Plaintiff worked at that office and remotely from her home in Johnson County at all times during her employment with Defendant.

8.      Defendant works in an industry affecting interstate commerce, in that Defendant sells various insurance policies to clients throughout the United States.

9.      Defendant employed more than 15 but less than 500 employees in 2019 and 2020.

10.     Thus, Defendant is subject to Title VII of the Civil Rights Act ("Title VII"), the Pregnancy Discrimination Act ("PDA"), and the Emergency Paid Sick Leave Act ("EPSLA").

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because each of Plaintiff's claims arises under the laws of the United States, specifically Title VII, the PDA, and the EPSLA.

## FACTS COMMON TO ALL COUNTS

12.     Plaintiff began to work for Defendant in February 2020.

13.     Plaintiff was hired to work as a Client Services Representative and assigned to Defendant's office in Overland Park, Kansas.

14.     At the time Plaintiff accepted her position with Defendant, Plaintiff was pregnant with an expected due date in August 2020.

15.     Plaintiff notified both Dawn Ozga, the Chief Financial Officer of Defendant, and Cody Smith, the owner of Defendant, of her pregnancy and anticipated due date.

16.     Ozga and Smith told Plaintiff that they would work with her regarding a period of leave once the baby was born.

17.     The three agreed to discuss that leave closer to Plaintiff's August due date.

18.     Plaintiff began working in Defendant's office, where she was largely trained by her coworker, Mandy Parrish.

19.     For the first several weeks, Plaintiff worked without issue and with great success in her new position.

20.     However, on March 24, 2020, Johnson County issued a stay-at-home order in response to the increasing spread of the COVID-19 virus.

21.     As a result, Plaintiff and all other employees of Defendant were mandated to work remotely effective March 24, 2020.

22.     Plaintiff continued to work and complete her training with Parrish, utilizing phone calls and video conferencing.

23.     Plaintiff continued to do well with her work, and often received praise from Parrish.

24.     At no time did Parrish remark that Plaintiff was struggling or that training Plaintiff remotely was proving to be ineffective.

25.     In late April 2020, restrictions imposed by both the State of Kansas and Johnson County began to be lifted and replaced by more permissive restrictions.

26.     Plaintiff decided she should consult her doctor and her then-7-year-old daughter's pediatrician in anticipation of how to safely return to work.

27.     Plaintiff's daughter is considered extremely high risk for any lung infections.

28.     Prior to 2020, Plaintiff's daughter had been hospitalized on occasion for respiratory viruses and conditions.

29.     Both Plaintiff's OBGYN and Plaintiff's daughter's pediatrician recommended that Plaintiff continue to work from home at least until Plaintiff gave birth.

30.     After receiving this news, Plaintiff contacted Smith to request a meeting with him.

31.     On May 1, 2020, Plaintiff and Smith had a long conversation about the recommendations that Plaintiff had received from the medical providers.

32.     Smith told Plaintiff that he was willing to work with Plaintiff because of the recommendations.

33.     Smith agreed that, even if other employees were able to come back, Plaintiff would be able to work remotely until she gave birth.

34.     Smith told Plaintiff that she should come up with her "maternity leave plan" regarding what the 12 weeks following the birth would look like as far a work schedule.

35.     Smith told Plaintiff that he would like to have Plaintiff work part-time from home during some portion of those 12 weeks, and then return to full-time work.

36.     Plaintiff told Smith she understood, and would discuss the issue with her husband and get a proposed "maternity leave plan" back to Smith.

37.     Around May 6, a video conference was held with all the office staff.

38.     At the conference, one topic discussed was the return of staff to the office on May 18, 2020.

39.     Smith specifically discussed that Plaintiff would not be coming back, but instead continuing to work from home until around November, 12 weeks after Plaintiff's due date.

40.     However, Smith then told Plaintiff for the first time that he wanted her to start coming in to the office one day a week until she gave birth.

41.     Plaintiff was caught off guard by this because it had never been discussed previously.

42.     Plaintiff was on the spot, with all of her coworkers watching her.

43.     Plaintiff told Smith she would try that schedule.

44.     Smith instructed Plaintiff to come back on May 29, 2020.

45.     Plaintiff continued to work from home until May 29.

46.     On that day, Plaintiff reported to work as instructed.

47.     Plaintiff continued working primarily from home and coming in to the office only on Fridays for approximately six weeks.

48.     During this time period, other employees of Defendant who had non-pregnancy related health concerns were allowed to work from home.

49.     However, Plaintiff was the only such employee who had a mandated day in the office each week.

50.     After six weeks of this schedule, Parrish told Plaintiff that she really did not need to come in for training.

51.     Plaintiff asked Parrish if Parrish believed Plaintiff was ready to work completely independently.

52.     Parrish agreed that Plaintiff was proficient with the job assignments, and ready to be taken off training.

53.     Around this time, Plaintiff attended an appointment with her OBGYN.

54.     At the appointment, Plaintiff disclosed that she had started working in the office one day a week.

55.     The doctor cautioned Plaintiff against doing this.

56.     The doctor repeated that Plaintiff should be working remotely as much as possible, particularly in the later part of her pregnancy.

57.     Plaintiff told her doctor that she would ask to be excused from coming in to the office on Fridays.

58.     On July 9, 2020, Plaintiff email Smith.

59.     In that email, Plaintiff explained what her doctor had recommended and asked that she be excused from coming into the office each week, instead working from home full-time as she had from March 24 to May 29.

60.     Plaintiff also recounted that Parrish had recommended that Plaintiff was ready to work independently, and any additional training could be effectively completed with Plaintiff working remotely.

61.     Plaintiff concluded by stating that Parrish and Plaintiff had been discussing Plaintiff's post-birth schedule and should have the proposed plan to Smith shortly.

62.     Plaintiff copied Parrish on the email.

63.     The following week, Plaintiff was discussing her maternity schedule with Parrish.

64.     Parrish mentioned to Plaintiff that on July 10, a meeting had been held concerning Plaintiff's email.

65.     Parrish had attended the meeting along with Jacob Parr and Josh Morrow, two employees who served in quasi-office manager roles.

66.     Parrish told Plaintiff that the meeting had been set up following a meeting between Smith, Parr, and Morrow about Plaintiff's July 9 email.

67.     Parr had told Parrish that Smith was extremely angry about the email, particularly the request to no longer come to the office on Fridays.

68.     Parr said that Smith was demanding to know what Plaintiff planned to do regarding her schedule after giving birth.

69.     Smith had told Parr that the schedule had to be in Smith's hand by the end of the week.

70.     However, Parr suggested that Plaintiff and Parrish send the schedule to Parr, not Smith.

71.     Parr said that Smith was so angry about Plaintiff's email that it was best to keep him out of the discussions.

72.     Plaintiff asked Parrish why Plaintiff had not been part of this meeting about her schedule.

73.     Parrish said she didn't know, the meeting had been set up by Parr after Parr had spoken with Smith.

74.     Parrish and Plaintiff completed the maternity schedule that week.

75.     On July 16, 2020, Parrish emailed the proposed schedule to Morrow and Parr.

76.     Plaintiff had proposed to continue working remotely until the birth, then be completely off work for six weeks, work a third of her normal hours remotely for approximately six weeks, and then return to full time work in the office.

77.     Shortly after the plan was emailed, Parr responded.

78.     Parr stated that Smith would have to approve the schedule because Smith "was pretty adamant to us that no one is working from home anymore."

79.     Parr wrote that "some things have changed and [Smith]'s not allowing that [working from home] for anyone within the organization."

80.     Parr suggested that Plaintiff just set a number of weeks for which she would be off work, and then return to full weeks at the office.

81.     This was the first time that Plaintiff had heard that Smith wanted her back in the office full time.

82.     Plaintiff was also surprised that her part-time schedule was rejected, as Smith had explicitly stated that he wanted Plaintiff to work a few hours from home and then return full time after 12 weeks.

83.     Plaintiff replied to Parr's email explaining why she had outlined the plan the way she did.

84.     Plaintiff asked that she be included in any meetings about altering the schedule so she could understand what the expectations were, referencing the meeting on July 10 that was held without Plaintiff's knowledge.

85.     Plaintiff also explained that she was asking to work remotely until the birth because medical providers had recommended it, not because she wanted to do it.

86.     Parr responded that Plaintiff needed to discuss things directly with Smith and Ozga because Parr had received very different information.

87.     On Friday, July 17, Plaintiff emailed Ozga and Smith regarding the proposed maternity schedule and Parr's comments.

88.     On Monday, July 20, Ozga replied to Plaintiff's email.

89.     Ozga told Plaintiff that, despite the recommendations of the medical providers, Defendant would be requiring that Plaintiff work in the office full-time beginning on July 22, 2020—approximately 40 hours from the time the email was sent.

90.     Ozga stated that because Defendant was "operating under the governor's orders to social distance and wear ma[sks]" the accommodation recommended by Plaintiff's OBGYN would not be offered.

91.     Plaintiff requested a written document from her doctor stating that Plaintiff needed to work remotely until the birth.

92.     On July 21, 2020, Plaintiff received and provided that document, as well as a similar recommendation from her daughter's pediatrician, to Ozga and Smith.

93.     In that email, Plaintiff explained that she need to do what her doctor recommended.

94.     Plaintiff asked what had changed that brought about this very abrupt demand that Plaintiff return to the office.

95.     Plaintiff noted that COVID-19 cases were increasing at the time, in addition to Plaintiff being later in her pregnancy.

96.     Plaintiff questioned why the accommodation she had been provided for nearly four months was now being revoked.

97.     Less than 10 minutes after sending the email, Smith responded to Plaintiff.

98.     Smith responded: "Remember we are running a business[,] please be in the office tomorrow[. T]here is no more discussion on this."

99.     Smith stated the Plaintiff had to "respect the company's decision to not offer work from home" and needed to let Defendant know if she would not be returning to work on July 22 so Defendant could "make the appropriate adjustments."

100.     Plaintiff responded that she felt she was being singled out because of her pregnancy, particularly because other employees were still being allowed to work from home due to non-pregnancy, health-related concerns.

101.     Plaintiff asked that she be allowed to complete her work from home, as she had done the previous months.

102.     Plaintiff stated that she would begin her remote shift the following morning unless she was told she could not by Smith.

103.     Smith again replied, telling Plaintiff "don't try to tell me what I can and can't do with my business."

104.     Smith told Plaintiff that unless she was in the office tomorrow morning and "everyday moving forward," Plaintiff would be discharged from employment.

105.     Smith concluded the email by writing:

I want to make it clear you don't tell me how things are going to be I will tell you how things are ran in my business and I also don't like the victim tone you are using with me we are treating you exactly like we treat all other employees. If you feel this isn't the place for you we completely understand and once again you do with is right for you and your family but you will work from the office or you will be off without pay. I'm not sure how much more clear I can get on this.

(all errors in original).

106.     After receiving the message, Plaintiff attempted to reply, but found that she was locked out of her work email account.

107.    Plaintiff replied to Smith using her personal email account, requesting that she be Emergency Paid Sick Leave ("EPSL") pursuant to the EPSLA, as she was unable to work due to the advice of a healthcare professional.

108.    Plaintiff also requested to use Expanded Family Medical Leave pursuant to the Emergency Family and Medical Leave Expansion Act.

109.    Plaintiff offered to provide any additional information Defendant needed to begin facilitating Plaintiff's use of these benefits.

110.    On July 22, 2020, Smith emailed Plaintiff stating that she had been discharged from employment.

111.    Smith claimed that Defendant was exempt from the obligations of the Families First Coronavirus Response Act due to Defendant's number of employees.

112.    There is no exemption based upon fewer than 50 employees from the obligation to pay EPSL based upon a recommendation from a healthcare professional.

113.    Further, Defendant would not qualify for any hardship exemption because, *inter alia*, Plaintiff could have worked from home, but Defendant refused to provide Plaintiff with that option.

114.    On or about October 26, 2020, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant had engaged in the discriminatory and retaliatory actions being alleged in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

115.    A Notice of Right-to-Sue letter dated November 30, 2020 has been issued by the EEOC and this action is being brought within ninety (90) days of the issuance of such Right-to-Sue letter.

116.    Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

117.    All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

### COUNT I – PREGNANCY DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT AND PREGNANCY DISCRIMINATION ACT

118.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 117 of her Complaint, as though fully stated herein.

119.    Plaintiff is a female and was pregnant at all times relevant to this lawsuit.

120.    Plaintiff was an employee of Defendant.

121.    During her employment with Defendant, Plaintiff was subjected to adverse actions by Defendant, including but not limited to denying Plaintiff reasonable accommodations for her pregnancy and taking away benefits promised to Plaintiff.

122.    Plaintiff's pregnancy, a sex-specific trait, was the motivating factor in this conduct.

123.    Defendant knew of this harassment, as it was being conducted by a managerial employee.

124.    Defendant failed to take prompt remedial action to correct or prevent this harassment.

125.    Other non-pregnant employees were allowed the accommodation that Plaintiff was ultimately denied.

126.    The conduct of Defendant was outrageous and evidenced an evil motive or reckless indifference for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

127.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

128.    Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses incurred herein; for her attorneys' fees; and for all other relief deemed just and proper by this Court.

## COUNT II - RETALIATION IN VIOLATION OF
## THE CIVIL RIGHTS ACT AND PREGNANCY DISCRIMINATION ACT

129.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 128 of her Complaint, as though fully stated herein.

130.    Plaintiff engaged in activity protected by Title VII and the PDA, including requesting reasonable accommodations for her pregnancy.

131.    Plaintiff also complained about actions prohibited by Title VII and the PDA, including discrimination based on pregnancy as outlined above.

132.    Defendant took adverse actions against Plaintiff.

133.    These adverse actions included discharging Plaintiff from her employment, inconsistently enforcing policies against Plaintiff, withdrawing benefits offered to Plaintiff, unfavorably altering conditions of Plaintiff's employment, and denying Plaintiff benefits to which she was entitled.

134.    The motivating factor in these adverse actions was Plaintiff's protected activity outlined above.

135.    Thus, these were acts of retaliation.

136.    The conduct of Defendant was outrageous and evidenced an evil motive or reckless indifference for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

137.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

138.    Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; for her attorneys' fees; and for all other relief deemed just and proper by this Court.

## COUNT III – FAILURE TO PAY EMERGENCY PAID SICK LEAVE IN VIOLATION OF THE EMERGENCY PAID SICK LEAVE ACT

139.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 138 of her Complaint, as though fully stated herein.

140.    Plaintiff was unable to work due to the need for leave because she had been advised by a healthcare professional to self-quarantine due to concerns related to COVID-19.

141.    Plaintiff provider notice of these facts to Defendant within a reasonable time.

142.    Pursuant to the EPSLA, Plaintiff was entitled to up to 80 hours of EPSL during this quarantine.

143.    Plaintiff's quarantine lasted for the full two weeks, making her entitled to the full 80 hours of EPSL.

144.    Defendant refused to pay Plaintiff this EPSL.

145.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

146.    Thus, Plaintiff is entitled to an award of liquidated damages in an additional equal amount to the unpaid EPSL.

147.    Plaintiff is also entitled to recover her costs and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in the unpaid EPSL, liquidated damages in an equal amount, for the costs of this action, for attorneys' fees, and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT IV – RETALIATION IN VIOLATION OF THE EPSLA

148.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 147 of her Complaint, as though fully stated herein.

149.    Plaintiff sought leave pursuant to the EPSLA.

150.    Defendant took adverse employment actions against Plaintiff, including but not limited to discharging Plaintiff from employment.

151.    Defendant's adverse employment actions taken against Plaintiff were each based upon, and directly motivated by, Plaintiff exercising her right to leave under the EPSLA.

152.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

153.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

154.    Thus, an award of liquated damages and/or punitive damages is appropriate.

155.    Plaintiff is also entitled to recover her costs and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000; for a penalty of liquidated damages and/or punitive damages; for the costs of this action; for her attorneys' fees; and for such other and further consideration and relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,


 */s/ Daniel L. Doyle*
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
ATTORNEYS FOR PLAINTIFF